Secretary of the U.S. Department of Homeland Security, in her official capacity, et al, at the balance. Mr. Ensign, for exit balance. Mr. Balancristian, for exit balance. Good morning. Good morning. Oh, no, afternoon. Good afternoon. May it please the Court. Drew Ensign, Deputy Assistant Attorney General for the U.S. Department of Homeland Security. I'd like to reserve four minutes for rebuttal. The universal relief order below defies binding precedent multiple times over and should be stayed pending appeal. For more than 130 years since Nishimura and recently reiterated by the Supreme Court in Thursday, it has been well established that aliens who are not lawfully admitted into the country are only entitled to whatever procedures that political branches provide. And that the plaintiffs cannot rely on the due process clause to impose additional procedural requirements. As the Supreme Court explained in Thursday, the due process rights of an alien seeking initial entry are simply, quote, whatever procedures are authorized by Congress, end quote. That applies even to those who lawfully presented themselves to ports of entry and have been present in the United States for years. Notably, in the Kaplan case, for example, the alien at issue had been present in the United States for eight years. Mr. Ensign, before we get to the merits of the due process argument, I'm wondering whether the plaintiff's claims here are barred by the 60-day time bar. Your Honor. Because we've said that in MMV that that's jurisdictional. So, first, they have to get past that time bar. Your Honor, it's a bit of a mix of things. We haven't specifically raised that in our state papers. It is jurisdictional. We certainly think it could be. And in particular, in 2002, the executive expanded the expedited removal to the statutory limits for all aliens that arrive by sea. And so, as to those aliens, wherever present in the entire interior of the nation for up to two years, they have been subject to these procedures for the last 23 years. And that has not been challenged. So, we certainly think that that bar would apply under that logic and would bar the claims here. Well, because, as I understand it, the plaintiffs aren't, there are no new due process, there are no new procedures in the designation or in the Huffman Memorandum. So, any procedures that are being applied are decades-old procedures. That's correct, Your Honor. They're applied to an entirely new class of people, an entirely different geographical area. Your Honor, I agree that it's a new class of people. I disagree as to the geographical area. Let me say when I say class, because that could be very confusing. I just mean just sort of the whole population that now could potentially be at least thought to maybe not be here lawfully. So, if you just think of the entire population of the interior of the United States is now governed by this regime. So, that's what I meant, just to be clear. For land arrivals. For people who arrive by sea, this has been the law for 23 years. Right. So, for land arrivals. And so, it's a whole new suite of people who are now brought into being covered by this system. And then a decision was made that the same procedures we had for within, shall we say, 100 air miles, I think is how it was defined, will be applied across the entire nation. So, there was a judgment. They could have adopted different procedures. Much has been talked about in past years about that. They made a decision to take those procedures, long-tested, as you said, and move them to an entire new part of the country. That's correct, Your Honor. So, that's what's being challenged here. That's correct, Your Honor. Whether those procedures are adequate for the new, both geographical jurisdiction and just the grouping of peoples to which it will now be applied. That's correct, but I think it's important to note in that while the district court believed it was a new and unprecedented issue, that someone would have to prove that they've been in the country for longer than two years rather than 14 days, that has, in fact, been the law for sea arrivals for the last 23 years. Well, whose burden of proof is it, actually? The statute places that burden on the alien to show that they have been present in the United States continuously for the two-year period or whatever the applicable period is. But isn't one of the challenges that how does the non-citizen have the opportunity to do that if they are essentially picked up or captured at a deportation proceeding or at an airport or anywhere that's beyond the sea? How do they have that opportunity to actually prove what you just mentioned? Your Honor, I don't think that's presented here, so let me explain why and then explain to you what their opportunities would be, but I don't think that's presented here for a number of reasons. First of all, there's simply no standing for that claim. Of the two people, the main plaintiffs that said they had been exposed to this issue, both of them expressly disavowed seeking any relief by the Section 705 motion, and no one else has alleged that they've been exposed to this particular issue or are likely to do so eminently. And so under Summers, there is no standing for this claim, and so it fails on that account. It also fails for a second reason, which is that it's not a cognizable claim. It's essentially a claim seeking additional procedures, but there's not a due process interest specifically in it in more procedures rather than that. That's a merits argument, not a jurisdictional or standing argument, right? It's a threshold argument why you wouldn't get to the merits, but you're correct. That's a merits argument rather than a standing one. My personal understanding, this would be more of a threshold one. And as the Supreme Court said in Olam, process is not an end in and of itself. Its constitutional purpose is to protect a substantive interest to which the individual has a legitimate claim of entitlement. So wrongly being placed in expedited removal rather than Section 240, as long as it reaches the correct outcome, is not a due process violation. As long as those procedures are adequate, there's not a process interest in more process itself. As to how it's presented, you know, there's very little record evidence on this, because as far as we can tell, no one has ever encountered this issue in a way that's meaningful. But my understanding is that under 2019 guidance, the immigration officer asked several questions and needs to essentially elicit information as to all of the relevant questions. You know, this has been the law as to sea arrivals for the last 23 years, and I don't believe there's any evidence in the record that anyone has failed to understand that their duration in the United States, presence in the United States is a potentially live issue on which they need, you know, may need to present evidence. They're simply not... Are they specifically asked about whether they've been present for two years? I don't know if... Are they given notice that they're being put into expedited removal proceedings because there's no evidence that they've been continuously present for two years? Your Honor, I think that is very typically the case. My understanding is that the way this operates is that immigration officers are told to elicit information as to all of the relevant questions that are, you know, presented as to expedited removal and presence is obviously one of those. Where are they told that? Where does it say that they are told? I mean, what I've seen in the record is that they're asked to identify if they have credible fear, persecution. All the forms said that. Is there something in the record? Is there something in an official document that says you will also ask all the criteria that would render you eligible or ineligible, honestly, for expedited removal? Where is that? Your Honor, I don't know that that's specifically in the record, but I will point out in the... In specifically in the record? Not that I can quote to you. In the record that says that. In the record actually, there is record evidence of exactly what you do ask. Not that I can point you to right now. What I can point you to right now is in the 23 years that, for sea arrivals, that people have had to prove their presence longer than two years. No one has ever failed to understand... Has that been litigated? What's that? Has that been litigated? Not to my knowledge. Not to my knowledge of anyone... That doesn't really tell us a whole lot, does it? Your Honor, I disagree. I think it does. I think that this has been applied to tens of thousands of aliens, and they don't have a single one who has come forward to say that, I didn't understand that it was... Now you're in the millions. Now you're in the millions. Now you're in the millions and millions and millions and millions of new people. And so the fact that you have this little small community that was covered, sea arrivals, most of whom I assume are captured within 100 air miles of the border, doesn't seem to say much to the question of now that you have, you're covering... The Secretary made the decision to have this broad sweep. The statute authorizes the Secretary to go to this full extent, but that's just a separate question of how you then go about sorting out who is even statutorily eligible for expedited removal. And there's nothing in the scope of the protected designation that allows sweeping anyone who's not statutorily covered by expedited removal. Right? The DHS cannot exceed the maximum scope of the statute. I agree with that. Right. And the maximum scope of the statute would exclude people who have been here, I think it's more than two years, right? If you're right at two years, you're not covering... If it's more than two years? It's two years plus a continuous presence requirement. Continuous presence, right, but the time is... More than two years, two years and a minute, I suppose, continuously. And so as to that, there's absolutely no evidence on the record that anyone in response to Judge Rye's question is asked about that or informed that that's a relevant factor as to whether they're even eligible for this expedited removal. Your Honor, I'm not going to say categorically there's nothing. There's nothing that can cite you as standing at this podium, but I think I draw... Do you think there might be something in the record that you're just not calling to mind right now? It's conceivable, Your Honor. Do you have a particular thing in mind, you just can't remember if it's in the record? Your Honor, I'd want to go back. There may be guidance. It's not definitive. My understanding in talking to the clients, and I want to be very careful because I want to sort out between what I've had conversations with the clients about and what is strictly in the record. Right now, I can't point you to any specific evidence, but I think it is very useful that absence of evidence to point out that we do not have a single plaintiff who was ever alleged... I just want to go back to your response, Judge Rye, was that your understanding was that agents ask... I'm not going to phrase this exactly as your words, so correct me if I'm wrong, but that they ask about whether people meet the criteria for expedited removal. Exactly, Your Honor. They are trained... The forms do not specifically identify that, but they are trained to elicit information as to all... Where is that training? Your Honor, it's in the 2019 guidance, which I'm not sure if it's in the record or not. We're certainly happy to submit it to the court. But, again, we have zero plaintiffs that have ever said... I'm trying to get what the record is here as to what people are getting. In fact, someone hasn't complained. They didn't have time to complain. But they... You're telling me that you think there's 2019 guidance that talks about that they're trained there to ask about the two-year question that Judge Rye... They're trained to ask generally about all relevant questions as to the... Well, are they told what the relevant questions are? They are trained on what the relevant questions are, yes. And do you believe that one of those relevant questions is if you're here more than two years continuously? That has always been a live issue. Under the prior designation, it was 14 days. Now it's two years. But the duration has always been a live question in expedited removal. And they're trained to ask about that? That's my understanding, Your Honor. Ms. Jones, can I ask you another Rushfield question? So in Make the Road One, on which Judge Millett and I were on that panel some years ago, the court held that designation decisions were committed to agency discretion by law. And so that is a binding precedent of this court. And if that's the case, then there is no APA cause of action here. This is also a designation decision, the same as in Make the Road One. And if there's no APA cause of action, where would the district court have authority under Section 05 to order relief pending review? Your Honor, our understanding was that Make the Road decision didn't preclude review as a jurisdictional matter of due process claims. If you'd like to tell us... I'm talking about APA? Or potentially another cause of action. But so the district court here said they were... The district court said that it was not reaching the APA claims. But yet it entered a so-called stay under 705 under the APA. But under Make the Road One, there's no APA cause of action when a matter is committed to agency discretion by law, which this designation decision is. We certainly agree with that predicate. We had read Make the Road One as not precluding due process claims. But if we're wrong about that, we would be happy for this court to help. But due process, maybe there's an ultra-virus claim. But how would there be a claim under the APA? And once there's no APA cause of action, where is there any authority for the district court to enter this relief? Well, Your Honor, I mean, to start with, this is in the sole and unreviewable discretion of the Secretary. We believe that to mean that none of this is reviewable. This court told us otherwise in Make the Road One. We construed that as also not precluding their due process challenges. And we said that in No. 14, right? Make the Road One said there was jurisdiction. But it held that it was ultimately not reviewable because committed to agency discretion by law. Your Honor, we would be delighted to discover that their due process claim cannot be raised. There is the Supreme Court decision in Webster split that particular question a little oddly. I'm just wondering how you think it's even possible for there to be a due process APA claim when there's no APA cause of action. Your Honor, that's certainly an issue that we had considered raising and may well raise in our opening brief. I will acknowledge there are decisions on both sides of this issue. I've seen the Supreme Court in the Webster case, they committed to agency discretion, get rid of APA, but not that due process review. I've seen other cases read otherwise. Even if there's due process review, then wouldn't that have to be an ultra-virus claim or some equitable cause of action? Quite possibly, Your Honor. I mean, that certainly would be our front-line position. Courts tend to... Well, and if that was the case, if there was only the possibility of an ultra-virus claim, then you couldn't get a 705 stay. I believe that's correct. I guess you could get an injunction, but of course injunctions are explicitly barred by 1252F1. That is certainly correct about 1252F1. I actually don't know the answer to the question as to Section 705. Section 706, for example, provides a standard review even when you don't have an APA cause of action. I don't know if that same rule applies to Section 705. And so without an APA cause of action, I think it's certainly reasonable to believe that a Section 705 stay wouldn't be available. You haven't made this argument as a ground on which you're likely to succeed. You haven't made this argument in all the judge browsemaking, correct? You said you're reserving it. You may want to raise it later, but you haven't advanced that here as a basis on which you're likely to succeed. Not as to the second one, as to review being barred of the due process claim, we have raised in the district court. I mean, not the one that judge brought. I mean, this is still a threshold issue that we would have to reach. I mean, before we can determine whether an APA stay is permissible under 1252F1, we have to just, you know, we have to determine that the district court had authority to enter a Section 705 stay. And 705 talks about, you know, you can preserve the status or rights pending conclusion of the review proceedings. Review proceedings, I think it's most naturally meant to mean APA review proceedings, but there is no APA review here because the matter is committed to agency discretion by law. Your Honor, we certainly agree with those premises. We haven't specifically raised that in our state motion, but that's... Do you think we could reach that in this posture because it's a threshold issue? Certainly, Your Honor. I mean, the court's authority to reach issues like that is largely a matter of discretion, and, you know, at some point, there may be a Senator Ding-Smith issue, but I don't think so in this posture where, I mean, the scope of... The government raised this below, though, right? As to, yes, as to the question of whether or not the due process claim can be reached. We absolutely did. And we've certainly argued that a Section 705 stay isn't available and... Government's leaving a lot of arguments on the cutting room floor. Your Honor, we only have 5,200 words. That's very... In order for this, you know, certainly if we could get more words for where stays involve national policies, we would be delighted to take that opportunity, but we made what we thought were our strongest arguments in our 5,200 words. But related to your jurisdictional argument, what do we make about the Supreme Court's directive that there is a strong presumption in favor of judicial review and the plain language said under the 1253A3A goes to judicial review of constitutionality of the agency action? Your Honor, certainly, but the overlay here, that language certainly does exist, but it exists simultaneously. That is a more general statement as to programmatic challenges to expedited review. Here we are in the more specific context of what is the scope of the designation by the Secretary. That is committed to the Secretary's sole and unreviewable discretion, which she can exercise at any time, and we think this is difficult to control over the general. And on footnote 14 in our prior decision, we were explicit that we were not deciding whether there would be a causative action under the APA or otherwise, dot, dot, dot, if the Secretary's actions were unconstitutional. So I assume that's what you were referencing before as making the road not having resolved this question. That's correct, Your Honor. And as you just, I think, made clear, this argument is not one that you're advancing. Not that you're waiving it or anything for further proceedings, not here for your likelihood of success. It is not one that we've raised in our stated papers. Okay. All right. And whether there's a causative action is pretty clearly not a jurisdictional question for something. That's correct, Your Honor. And since we didn't hold and make the road about that unconstitutional conduct or reaching obviously beyond the bounds of the statute would be committed to agency discretion, that, again, doesn't fall into the jurisdictional hole for things committed to agency discretion. Not as to committed to agency discretion. There's separately the fact that Congress used unreviewable and, you know, certainly recognize that this court came out a different way, but I think we've... It's an awful heavy lift for the Department, which I guess I didn't see being made here, that the statute committed to the agency's discretion to act unconstitutionally. That's not what you're arguing. Obviously, you don't think there's a constitutional violation, but if we assume there's a constitutional violation, would your argument be that the statute committed to the agency the authority to act unconstitutionally? No, Your Honor. It would be that unreviewable simply means unreviewable, and thus the court would never reach the question of whether or not it was unconstitutional because unreviewable would mean the court... Well, that's the same thing as saying the Congress has somehow authorized you to engage in whatever conduct you want, constitutional or not, nothing the court can do about it. Your Honor, we disagree with that. We agree that that may ultimately be the result. The executive certainly strives to follow the Constitution, and it would simply mean that there is not a judicial remedy if the judiciary disagreed with that constitutional interpretation. And Supreme Court's been pretty clear about, back to my heavy lift of how very, very, very difficult it is to show that judicial review is cut off generally of legal questions and certainly of constitutional questions affecting individuals. Yes, Your Honor. We will acknowledge that the Supreme Court has made that presumption, but we think that presumption, and this is an argument we're just preserving, but we think that presumption is defeated by sole and unreviewable discretion. That is the sort of absolutist language that Congress uses when it actually intends to percolate judicial review altogether. All right. Did you want to talk about jurisdiction under 1292A1 for your review? It seems like a very confusing area of law, but that's also jurisdictional as well. I mean, 1292A1 is injunctions, but then it's just been interpreted to include things that have the practical effects of an injunction. So you have that on one hand, which I assume would be your argument here. But on the other hand, I can't find a case, and maybe you're aware of some, certainly from this circuit, where a 705 stay has been held to fall within that language. Are you aware of one from this court or the Supreme Court? Your Honor, we've certainly seen quite a number of Section 705 stays in the last 10 months. The Supreme Court has, this has repeatedly come up to the Supreme Court, and they don't seem to resolve it, regard it as a live issue at all. In the Venezuela TPS case, for example, that was a Section 705 stay. We got a stay from the Supreme Court there, 8-1. There have been, this issue has come up multiple times in the Ninth Circuit, and the Ninth Circuit has repeatedly concluded that Section 705 stays are appealable. Had another one in the CHMD parole case in the First Circuit. I believe that was a Section 705 stay. They concluded that. Did they go through the three Carson factors in each of those cases? I'm aware that the Ninth Circuit did in the Immigration Defenders case. That was in July of this year, going through the Carson factors. I think perhaps the greatest tell is Section 705, deciding whether or not to issue them, you use the preliminary injunction standard. That's because the factors that motivate it and the way that it operates is effectively identical to an injunction. And so courts- I mean, Supreme Court's put a lot of time in the can, at least, saying how it's not the same as an injunction. The two prongs here, so we've been talking about practical effect. Can you talk to me about the other prong, which can only be effectually challenged only by immediate appeal? How is that met here? Your Honor, the same way as in preliminary injunction cases, we will lose this for the duration of the appeal unless the court hears it now. I mean, I recognize it's a jurisdictional issue in that way, but it's also not one that is presented by the other side. I know, but we have to raise these issues and just check them. I think it's a very messy area. I mean, effectually challenged only by immediate appeal sounds like it's drawn from the Cohen test, which really means, you know, you have to come now. What would stop you from effectually raising these exact same arguments from a final judgment of the district court? The arguments would be the same, but we would be saddled with the- in the interim with the injunction-like order that restricts our ability to carry out. That doesn't- I mean, every Cohen appeal is, you know, something- if it's not allowed, you can say that. And so the question here is- because the declaration here, you know, talks about the burden on the government. I don't want to say inconvenience. That's too light. The burden on the government. It can't implement the statute as it sees appropriate with the procedures it deems appropriate. And that could- it doesn't say they will- could cause some overcrowding or extra processing delays, but those don't sound like the type of arguments that would qualify for a Cohen wrong can only be effectually remedied on appeal. It's not by immediate appeal. So I disagree for a couple of reasons. First of all, we do think the fact that this operates- I mean, this, you know, walks, quacks, and swims like an injunction and should be appealable the same. Beyond that- Is there something about this 705 stay, or is your argument that every 705 stay automatically falls within 1292A1 without you having to show the- at least the third prong of Carson, maybe even the second one? Your Honor, that's certainly a position we've taken, and it's one that many other courts of appeals have not even soffited to, you know, to delve into. Right. They just haven't grappled with it. But we're grappling if we feel obliged to apply the Supreme Court's test from Carson. Your Honor, then in that case, I would say specifically here, this is a critical tool of immigration enforcement. This is not a small deal. This is absolutely critical to maintaining border control. The ability to conduct expedited removal is one of the executive's most important tools for maintaining border control and not being overwhelmed. I think the backlog now in Section 240- I would still like to jump in and say on there, what makes this specific stay an injunction? Because you're not being compelled to do anything, and it doesn't threaten the government with any civil or criminal contempt or other factors that tend to be commiserate with an injunction. Your Honor, that's not how we view it. We do not view this as a court order that we can just freely disregard. We do not view it as someone has been in the country for 23 months. We could just freely disregard the district court's order and that there would be no consequences to it. We follow court orders certainly, but the idea that the district court would view itself as powerless to enforce that- I would say it's limited just from your implementation, and then it would then go back to the district court to then go to a 706 proceeding. Your Honor, I don't think the district court would view its order as having that such limited effect. I think the district court would view its order as being binding and one that the government cannot violate. I don't doubt for a second- But you still have the opportunity to engage in expedited removal at the seat, and for anyone who's been here less than two years, and then there's still the 240 proceeding as well. So what are you losing other than moving into millions of other people to go inward into the U.S.? We're losing the entire things that are vacated, the entire policy. The district court essentially issued facial relief that did not give us a scintilla of the memorandum that was left in effect. The entirety of this order, and we think that's one of the problems here, is the district court awarded facial relief here without even attempting to satisfy the Soler no-no set of circumstances. But this is a total facial invalidation of the entire policy. The district court has focused on that there's only modest procedural protections in what you're saying. I mean, there was a long discussion earlier when we started the hearing about you all being able to point to any process or any information or real training in the record that suggests that these officers are asking people, you know, have there been that requisite continuance resident? Well, Your Honor, as to that first question, I think what the record reveals is that it's an entirely theoretical problem. As far as we know, no person has ever failed to understand that this was a live issue and thereby lost a viable defense that they had been in the country for, you know, a period of time. You have a lot of people coming into the country who don't speak the language. So to sit up here and represent no one possibly couldn't understand this, I think is a little rich. Well, respectfully, Your Honor, that's what Article III demands. Under Summers, they have to name an appointment that's affected, and their failure to do so means there's no Article III jurisdiction as to that claim. Ms. Jones, if I can ask you on the due process question, the government argues that unlawfully admitted aliens have no liberty interest in staying within the territorial United States. And even if we assume that that's true because they are here unlawfully, what is this court supposed to make of the Supreme Court's decisions in JGG and AARP where the Supreme Court seems to recognize that they have some liberty interest? Certainly, Your Honor. What is the scope of that liberty interest? I mean, maybe it's very minor. I mean, maybe they have a liberty interest, for instance, in not being unlawfully removed. But the government's position does seem to be at odds with the Supreme Court's decisions. And I think JGG was a unanimous decision. I mean, on the emergency documents. Yes. Let me tease that out a little bit because that may have been slightly imprecise. I think the important thing is, I mean, due process is flexible, and it applies differently in different contexts. And so the liberty interest that they would have in fighting removal under Title VIII is defined by Nishimura and Thurasigiyam, and that only gets them what procedures are provided by Congress. So what they lack in that context is a liberty interest that can get them additional procedures under the Matthews v. Eldridge test. The first thing, though, is to figure out what – due process doesn't apply at all unless they have some liberty interest. So it seems that it is important to be precise about what their liberty interests might be here. So I understand you just jumped ahead to the fact that they may not get additional procedures, but how does the government understand the liberty interest? Because I take the briefing to suggest there's no liberty interest at all. I think it's whatever the liberty interest is, that it can be vindicated in fighting Title VIII removals by whatever procedures Congress provides. And so the liberty interest in due process clause gets you whatever procedures that Congress has provided and no further. So that the government has to have some, you know, at least it would be helpful if the government had some position on the liberty interest because Make the Road says the liberty interest is a liberty interest in remaining in the United States. That's a very robust liberty interest. It depends on the – So what is the – I mean, I assume the government doesn't agree with that liberty interest, a very expansive interest. There is such an interest that that gives rise to very different protections in different contexts. And the critical delineation that Congress has drawn is the line at lawful admission. Here's how they described it in the Landon case. But I'm saying for people who are in this category, people who the government says are subject to expedited removal, what is their liberty interest? It would actually depend on whether or not they've been lawfully admitted. So someone who, for example, overstayed a visa may have – may potentially have additional procedural interest or have interest that would give rise to additional procedures because they've been admitted. In the Landon case, what they said is once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly. So unlike the district court thought that status changes by being in the interior or being present lawfully or not for some period of time, but that's incorrect where the line changes at admission. And I think the Supreme Court's decision in Kaplan is particularly instructive on this. That's not right. The statute draws a line that puts people who have been here more than two years, even unlawfully, outside the scope of those who can be subjected to expedited removal. Correct? As a matter of the statute, that's correct. As a matter of the statute, they're outside of that scope. And the Supreme Court has recognized time and again that those who are in this country unlawfully, especially those who have been here for longer periods of time, have due process, liberty, interests. Do you dispute that? Your Honor, I dispute. I think the implication being drawn from that. I don't talk about implication. I'm just asking you. I just made a statement to you. Is that an inaccurate or accurate statement of what the Supreme Court has said? I think it is. As I heard it, I believe it may be inaccurate insofar as. Why inaccurate? Well, for example, I think the Kaplan case makes clear that the two years would not get an additional due process interest. In the Kaplan case, the alien would have been. . . Beyond what Congress has afforded? What's that? Beyond what Congress has afforded. What Congress has afforded, those who are here more than two years, routine removal proceedings and not expedited ones. And there's no question in my mind that there's a different amount of process that you receive in a 240 proceeding than expedited removal. Congress has said you get that process. Your Honor, I think I disagree with that for two reasons. The first. . . So you just said that these folks are statutorily. . . I'm talking now about people more than two years. Are statutorily barred from being subjected to expedited removal by the two political branches that have control over this very topic. Correct? Your Honor, if I can clarify that answer, I think there are cases where that might not be correct. Where that may not be correct is Congress has assigned the burden on the alien to show that they have been continuously present for two years. Because of that burden of proof, there may well be people that have been present longer in the United States than three years or longer than two years but cannot satisfy the burden. You have to prove that you're eligible for whatever level of protection and process you're claiming. Your Honor. That goes without saying. All right. But I'm just. . . They've been here. And let's assume they can prove it. But Congress doesn't say those who can prove it, by the way. It says those who have been here more than two years. Your Honor. Are not subject to expedited removal. Full stop. All right. They are outside this. Now, you can go through your proof issues with them in a 240 proceeding. All right. But there's a burden here on the Secretary to make sure. . . I thought we'd agreed upon this earlier. That you are not violating the lines drawn by Congress in this statute. Are you claiming that the Secretary has the ability to throw a big rope around an entire area, draw everyone in. If they don't have immediate proof on their body that they've been here more than two years, you get to sweep them into expedited removal without making sure they qualify for expedited removal? Is that your answer? No, Your Honor. But what we. . . We have to use constitutionally sufficient procedures to do so. Constitutionally sufficient is a very important word here. And so you have to use procedures sufficient to determine that someone has not been here more than two years before you may subject them to expedited removal. Your Honor, we don't think that that states a cognizable due process claim. I'm just asking you, is the government of the view that it has to have procedures that are sufficient to determine that the people that are subjected to expedited removal are statutorily qualified for expedited removal? Yes, Your Honor. That's how we read the statute. But we do not believe that they have a cognizable due process claim in order to challenge that. Because as the Supreme Court has made clear in the Olim case, you cannot have an entitlement to just additional procedures. The statute also excludes people who have been admitted. And is your answer the same for them? People who have been admitted can still be subjected to expedited removal under your view if they don't have immediate proof on their bodies when detained that they've been admitted. Your Honor, I think as to people that have been admitted, they could potentially avail themselves of the due process clause to impose additional procedures. I'm not asking you a due process question. I'm just asking you about your implementation of the statute. As much has been said here about what's committed to the Secretary's discretion and what is not. And I think we've agreed that applying expedited removal in a way that crosses statutory lines is unlawful. Is that correct? Your Honor, the Secretary certainly believes that she has a duty to comply with the requirements of the statute. If you apply this in a way that crosses statutory lines, that would be unlawful. Yes or no? If you're violating the statute, that would violate the statute. I think that's correct. That would be unlawful. That would be, to violate a statute would be unlawful. It may not be repealable. So sufficient procedures, the procedures have to be sufficient to allow determination that someone is within the group of people eligible for expedited removal. Is that correct? That's correct, although we don't think that is a cognizable claim here, both because of the lack of standing and because you don't have a due process interest in additional process. I think it might also be helpful to point out the robustness of these procedures and how much the risk of error is overwhelmingly allocated to the government. As the Supreme Court recognized in Thurisigium, a full 77% of people that express fear are, there's fear, that is considered at three different levels. It's considered by the immigration officer. It's considered by a supervisor. And if it's necessary, considered de novo. I get what your procedures are on fear, fear of persecution, fear of return, whether they might qualify for asylum and the procedures you have for that. And that seems to me that probably would not materially change whether you're within 100 air miles or in the interior of the country, but processes seem to work the same. So my question is as to, there's no questions. There's no evidence on this record, and you haven't provided any, and I take your point that you think there might be something there, but it hasn't been provided to us. So if anyone is asked, have you been admitted? Have you been granted asylum? Have you been here more than two years continuously? I think they are certainly asked about immigration status, but certainly there's a complete absence of evidence of being here. If they were asked immigration status. If they were, for example, they're a citizen or a green card holder, or if they've been granted asylum. And in fact, if you. Based on the form that they're asked, are you in those terms, or do they just say, what's your immigration status? I don't know the question that offhand. I guess I'm worried about sufficiency of the procedures here. This is what I'm asking as to this, whether you statutorily qualify for expedited removal. And so far, there's absolutely no evidence that anyone is asked. Have you been here more than two years continuously? To say that, even if you are asked that, what is the next process? Because you're telling us that these officers are qualified in terms of training that even if that question is not on the form about their continuous duration that they still ask these people. So, if they're asked, and then they say, yes, I have been here over two years. Then what is that next step? They're given an opportunity to prove that evidence. The Castano Declaration submitted in this court walks through that a little bit. Let me just go to that if you don't mind. They explain the multiple different things that they would accept to show continuous residence. They explain this is paragraph 6 of the Castano Declaration. They would accept evidence such as bank notes, leases, deeds, licenses, bills, church records, receipts, birth records, school records, employment records, tax records, or even the alien statements to the immigration officer or agent. I'm sorry, just quickly. Are you referring to that list with respect to the 2025 designation as opposed to the old process? This is the process that applies to everyone and has applied for some time. I don't believe there's been any changes in these processes. When do they, under the processes that we now place into this new extension of the statute, when are they given a chance to get this information? When and how? They are given a chance, I believe, to make a phone call to see people to do that. I believe they're also given an opportunity to, if necessary, to gather those documents that they may have collected. This is really, I think, important. So let's assume you've got a raid on a workplace somewhere and lots of people are rounded up. And there's reason to believe, I guess you would claim reason to believe that there are folks there who've been there, are there unlawfully. Interfered unlawfully, sorry. Tell me step-by-step what happens. So the agents have them in custody. What happens next? The agents will ask them questions to, will ask them about, you know, ask them questions about anything that might be relevant as to ascertaining their removability or whether or not. So they ask them about, you said immigration status, and then credible fear. I don't have the exact formulation of it, but they are definitely being asked about critical fear of, I guess, persecution, torture. So they're asked about those things. And if someone says no because they don't, are confused about, you know, they don't, their immigration status is they came here without documentation. So I think the answer to that is no, even though they've been here five years. So if they say no, I didn't come in here with lawful documentation. No, I'm not facing a credible fear. Then what happens? In that case, I think that, I think they would be asked a question about how long they've been present. And I think if. But there's nothing in the record that shows that, and the record so far shows the opposite. So let's assume they aren't asked that question. Your Honor, if you. What happens? Well, we're fairly far down the hypothetical chain, but I think if they don't. I'm actually asking operationally how this works on the ground, because it sounds like it's, I mean, that's the whole rationales is super fast. So they are, they then taken into permanent custody. What's the initial detention for questioning? So they've been taken into custody if they have answered no to both of those questions. I think that would typically be what would occur.  And then they are taken to a detention facility or a processing facility. Is that right? It could be. It may vary based on whether apprehended and where the circumstances are and what the detention capacity is. It's possible they might be paroled for a period of time. All of those are variables that are not squarely within the record. So I can tell you what my understanding of that is. I don't know that that is covered comprehensively. Let's assume they're detained. Because for obvious reasons, you probably don't want to parole people back in. And so, and is there evidence? What evidence is there that people have the time and there's the resources at the facility for everyone who's now been rounded up, plus everyone who's already in detention or in the processing facility to make a phone call? To have enough time for someone in their family to find all this documentation to show how long they've been here and continuously. And bring that documentation to them. And then they have another opportunity to show that to whom? First to the immigration officer. Then, if necessary, to the supervisor. They said no to the two questions. So there's no reason for an immigration officer to take it up to the supervisor. I assume once they say no and no on immigration, lawful immigration status and credible fear. I get if there's credible fear that goes up. But I assume that once they're in the detention facility, do you get questioned again by an immigration officer? What access do you have to an immigration officer? Can people bring you documentation? That is my understanding. We cited the 2019 guidance in our paper, so we can provide that by 20HA letter if desired. My understanding is— And in the record, there's 2019 guidance you keep referencing? I don't believe it's in the district court record. Again, this is an entirely theoretical problem for which there's no evidence that anyone has ever been injured or ever been confused about their burden. But to the extent that we want to talk about the possibility that this problem has never affected a named person, it might be a live one. We're certainly happy— Any name you're including does? They do not allege—first of all, they did not seek relief here. And second of all, they do not allege that the reason they were removed is because they didn't understand that it was their burden. Their declarations are skeletal. We don't know the reason as to why the result of saying that it did. If I may, too, I think for constitutional— They didn't understand that it was their burden. Is it not the government's burden to prove that they qualify for the removal? It is, in fact, their burden. The statute in section—so, 1225B1A, Romanat III requires the alien to affirmatively show to the satisfaction of the immigration officer that the alien has been physically present in the United States continuously for the two-year period prior to the date of the determination of an immiscibility. And so that is an allocation—that burden is allocated by Congress. And to do that, we have to assume, based on what you told us, that that question is being asked of them such that they could even meet this burden because it's not in the record that this is your process for this 2025 designation. Yes, Your Honor. It's also not in the record that anyone has ever failed to understand that and ever been, you know, put in—removed under expedited removal as a result of not understanding that. Yes, but the district court has put the stay in place—and I'd like to go back to in a minute for stay versus injunction—because there weren't these modest procedural safeguards. She didn't say what to do but just suggested that they were not there and that that was part of the—make the world's likelihood of success on the marriage. Your Honor, I completely contest the idea that this remedy is anything other than a maximalist remedy. It is universal in scope. It completely invalidates the agency action at issue. It is not tailored in any way. And, in fact, the district court explicitly disavowed any tailoring whatsoever. So if you thought that this particular—if the continuous presence issue was a live constitutional issue, the relief should be limited towards that. If, for example, I can't understand why a remedy that would impose additional procedures for those willing to swear under oath that they've been present in the United States for more than two years wouldn't address that concern and severely address the scope of relief here. Under that circumstance, you know, if you thought this was reviewable and if you thought this was a constitutional violation and if you thought there was standing, you should have relief tailored to that particular problem. You shouldn't be invalidating the entire system. Well, I think what the district court said here is she wasn't going to dictate how to address this sorting problem because she wanted to give the government, you know, discretion and flexibility to come back with means of dealing with it. Because you can imagine if they dictate a bunch of procedures, that gets challenged on appeal for sort of hijacking the discretion and expertise of the agencies. And then when they say, all right, here's the problem, I'm not going to dictate it. You need to come back and show me how you're addressing this problem. Has the government gone back to show the district court how it's addressing the problem? No, Your Honor, but let me explain. I disagree with the premise that this is restrained in any way, shape, or form. This is not restraining. I'm sure you disagree with my premise. I've laid out to you how I understand the district court decision here. And do you dispute that she left it open for the government to identify procedures that would comply with her order? She did identify some ways, and I think they are at war with the statute itself in a way that the government could not. Well, but for example, Your Honor. Yes, and so I just had a simple question. Have you gone back and said, maybe she didn't, quite frankly, you could do this. But have you gone back to the district court and said, you've misunderstood, we have this 2019 guidance, and someone somewhere made clear that all these officers know that that guidance applies now in 2025 to this whole new application, a whole new, this whole new regime where we're now bringing those procedures into the interior of the country. And when we do that, we're bringing in this 2019 guidance, assuming it says what you recall that it says. And so we've got the protections that need to be in place. No, Your Honor, we have not done that. If I may, I'd like to explain why we haven't and why we don't think that those, the flaws that the district court has identified are addressable because they're inherent in the nature of the legal errors that we're seeking review of. In particular, some of the flaws that the district court disavowed finding any constitutional problem with the statute itself, but the problems she identified are inherent to the statute itself. For example, she found fault with the allocation of the burden of proof, but that is something that has been allocated by Congress that, you know, the DHS lacks the power to contravene. Another flaw she found in the system was that it moved too fast. But expedited removal, Congress has mandated that it be completed to the maximum extent possible within 24 hours and always within seven days. So we'll agree, and you agree, that you as the agency, your agency has an obligation to ensure that there are processes in place that are sufficient, sufficient to ensure that the agency isn't subjecting someone to expedited removal who is statutorily disqualified from expedited removal. Now, you can tell me burden of proof all you want. What I'm trying to understand here is if Congress has said these individuals are not eligible, what has the secretary done to ensure what in this record before us? You want to send something in later? You can, but please answer it based on the record before us now. Sure. That's how I've been able to prepare for this case. And that is to ensure that you are not removing individuals who are statutorily disqualified from removal. But what the record shows is the secretary is using the same procedures that have been used for decades, and for people that have arrived by sea who are subject to expedited removal. We just don't know the answer to that. He's answered already several times now. I think he's answered the question several times. Well, there's nothing more that tells us how you deal with the sorting problem now for people. I mean, you're talking about a little tiny population, and there's just no record one way or the other on that. And, again, the problem with expedited removal is people hardly ever have the time to complain. And so here you are now dealing with land-based entries and a whole new application of this program to a broad swath. I mean, the entire United States now. And I assume you don't deny that there are a lot of people in the interior of this country that will have been here continuously more than two years. Do you think that I could be all wrong about that? No, we certainly believe there are millions of people here that are unlawfully present to the United States, some of whom have been here unlawfully present for some significant period of time. Probably more than two years at this point. And so I guess I'm still grappling with the sorting process here. When you keep saying that Congress said this and Congress said that, we have to read that in light of all the other things Congress did say, including don't apply it to these people. Certainly, Your Honor, but we also don't think there's a viable due process claim there, that there's not an interest in more procedures. And ultimately, the procedures being used to ascertain whether or not someone has a substantive right to remain in the United States, as opposed to a procedural right to a different set of procedures, those are robust. The Supreme Court looked at them extensively in their exegeum and found that the risk of error was overwhelmingly allocated to the government, that 77% of people that expressed a fear were then, that fear was found credible. They were assigned to Section 240 proceedings, but only 15% of them were ultimately granted asylum. So 85% of those people, the screening is so robust and assigned so much risk of error to the government, that 85% of people who are found to have a credible fear and expedited removal have a non-meritorious asylum. And that, we think that procedure is robust and sufficient to adjudicate these things. And certainly, as to the issue of- These things being a credible fear issue. Yes, Your Honor, but that's ultimately what this is geared at. Procedures are used to determine that in people's immigration status. We don't do Section 240 versus expedited removal as an end to itself, and that's what the Supreme Court recognized in the Olum case. But where in the opinion does the District Court ever compel the government to do something? Hasn't she only provided her reasoning for postponing the effective date of the designation and then therefore preserving the status quo pre-January 2025? Your Honor, I think this is absolutely identical in function to a prohibitory preliminary injunction. It operates no differently, and in fact, the District Court used the winter preliminary injunction test to determine whether or not the issue- An injunction requires you to compel some act. No, Your Honor, a prohibitory injunction would just prohibit us from taking acts, which is taking acts under this action. This is in all ways- Yes, prohibiting from taking acts that violate due process. But in all manners except styling, this functions like a prohibitory preliminary injunction. And yet they brought this as a stay under 705. They're not going to Rule 65 or anything else. Right. They're doing that as an end run around Section 1252-F1. We think that fails. We think that fails under the Supreme Court's decision in an all-among Gonzales, and we think that's another reason why a stay is warranted here. But the Section 705 is not because they didn't want a preliminary injunction. This is an end run around the explicit prohibition on injunctions. But 1252-F1 doesn't stop there. It says anything that enjoins or restrains a covered provision. That's not that it joins or restrains. Why do you take that to mean that somehow that is-enjoin and restrain aren't the same thing? You know, when you think about the belt and suspenders way of looking at language, where you're trying to mean the same term as the prior term so that we cover all the loops and that there are no ambiguities, gaps, or loopholes. So for multiple reasons, Your Honor. First of all is the-we do think that enjoins or restrains is not a doublet. It actually has independent meaning. If you look at 1252-F2, it uses just the word restrains. But 1252-F1 uses enjoins or restrains. Justice Alito in Aleman Gonzalez defined restrain consistent with injunctions, orders that inhibit particular actions. He did. He also defined restrains to mean-and I apologize. My notes have become a bit of a mess here. He defined restrains to refer to one or more forms of temporary injunctive relief, such as a temporary restraining order or preliminary injunction. But he didn't stop there. He defined restrains-quote, restrain means to, quote, check, hold back, prevent a person or a thing from some course of action, end quote. That's 596 U.S. at 549. This Section 705 stay absolutely restrains the government from using the expanded expedited removal designation to use expedited removal on people. Then would every stay operate as an injunction under your theory, even though in the statute they are using terms of stay, and then there are certain places where you use injunctive relief. In fact, Section 1251-F says limit on injunctive relief. So Congress had to mean a distinction in these terms. I don't think so, Your Honor. I think, again, F2 uses just enjoins. F1 uses enjoins or restrains. If it doesn't cover something beyond injunctions, then that language is superfluous in violation of one of the cardinal principles of statutory interpretation, that we don't read any word or phrase to be superfluous. Also, the effect of the Section 705 stay is precisely what Justice Alito for the court in Alman-Gonzalez said, you know, is something that restrains. The Section 705 stay does precisely what the Supreme Court defined restrain specifically within the context of 1252-F1 to me. But is the canon against surplusage absolute? Of course not, Your Honor. But, you know, it certainly has very strong purchase here where the very next subsection doesn't use it, so you would think a different result would obtain. And why does enjoin have to mean stay under your theory? Again, it sounds like you would always have a stay that means an injunction. Why couldn't it also just mean another form of a temporary injunction? Because that's not the plain meaning of the word restrain. We know that restrain isn't surplusage. It has some additional meaning. And then the Supreme Court has gone to the trouble of telling us exactly what that meaning is, defining restrain, and the Section 705 stay fits that meaning to a T. But even if we didn't have 1252-F1 here, you would still have traditional principles of acrobatics. What's the plain meaning of the word stay since you seem to be focused on injunction? What's your plain meaning of stay? I think it's very close to what restrain means, to check, hold back, or prevent, as the Supreme Court would define in Alderman Gonzalez. I think that's exactly what a stay does. But beyond that, I think even if you don't think that 1252-F1 applies, Section 705 clearly incorporates traditional equitable principles, and traditional equitable principles include the CASA principle of a prohibition of universal relief, or even just more generally, tailoring relief. And we not only have a failure of tailoring here, we have an explicit refusal to conduct such a tailoring analysis. Let me just, does Charles, do you have any more questions? No, thank you. All right. Other than just indicating, I'm not sure if you have any authority for the definition you just gave. Your Honor, I was quoting from the Supreme Court decision in Alderman Gonzalez, which was quoting a dictionary of some sort. I don't have that dictionary. No, we're talking about definition on stay, the word stay. Your Honor, I don't have a dictionary definition in front of me. All right. Thank you very much. Thank you. Mr. Balakrishnan? Good afternoon, Your Honors. May it please the Court. Anand Balakrishnan for Appellees Make the Road to New York. I'm sure the panel has specific questions for me, which I'd be happy to answer. I would like to, if you would like to start, I'd be happy to answer them now or begin speaking. Yeah. I mean, go for it. Yeah. So I guess I'll start on what seems to me a jurisdictional problem. Under 1252 E3B, there is a 60-day statute of repose. It's not a statute of limitation. It says that any action instituted under this paragraph has to be filed no later than 60 days after the date of the challenge section, regulation, directive, guideline, or procedure is first implemented. And the procedures that are being challenged here have been implemented for many years, certainly far longer than 60 days. So we have precedent in our circuit, MMD, that says the 60-day statute of repose is jurisdictional. So maybe you could start there. Of course, Your Honor. As the district court explained in response to a challenge that was raised on that basis by the government below, the object of this challenge is not the regulations or the statute, but rather the designation and the subsequent guidance. The action that we filed was within 60 days of that, and thus we clearly meet the jurisdictional threshold if that's what it is in 1252. So the designation and the Huffman Memorandum do not specify any procedures. They are simply expanding expedited removal to a larger class of individuals up to the statutory limit. But the designation and the memorandum themselves impose no procedures. The procedures that are being challenged as violation of due process are procedures that have long been in place. Your Honor, I think that's sort of confusing the jurisdictional threshold question as to what we're challenging with the sort of analysis of the claim that we're bringing, which is a due process challenge to the expansion of expedited removal through the designation. It's true that the designation does not specify any procedures, and, in fact, that's part of the problem right now with it, which is that the procedures that have been on the books, in some cases, are not tailored for this radically new class to which it's being applied, and in other cases are insufficient to deal with the unique challenges placed by them and the liberty interests of this new group. But the designation itself can't raise the due process problem because the designation simply says we are going to enforce expedited removal to the statutory maximum. So that is consistent with the statute. And so there's no claim that expanding the class is a due process problem. It's that the procedures that are being used are inadequate. And so that claim seems to me barred by the 60-day statute of repose. Your Honor, I think, you know, we'd rest. I do think, you know, of course, they haven't had a chance to fully brief this before the court, and I do think the district court reached it, and that decision was correct. The district court did not even discuss MMV, which is the precedent from just a few years ago, which says this is a jurisdictional bar and deals with a very similar issue and says it was, you know, there was no jurisdiction under this. And the district court, as far as I recall, doesn't even address this directly on point precedent. Your Honor, again, given, you know, I'd be happy to submit a briefing on it. I don't want to get anything wrong, you know, that we haven't written yet before you. But if I recall correctly, the reason the district court didn't have to address MMV was because MMV dealt with a very different issue, which is when the challenge was filed more than 60 days from this specific writing that was being challenged. Here, MMV doesn't seem applicable to me, which is the reason the district court wouldn't have had to address it, given the grounds of its reasoning. That is not how I read MMV, but I guess we'll just agree on that. Your Honor, go ahead. I did want to just follow up on a couple of things that, you know, were being discussed. You know, I think Judge Millett, you had talked about certain procedural problems. I think we have some more jurisdictional stuff we probably have to get through. On what basis are you challenging the designation itself, the designation order itself, as opposed to the procedures implementing it? I think specifically we're raising our due process challenge goes specifically to the designation, stating that the designation brings to bear against this new class of people an entire system of expedited removal that is not procedurally adequate to the liberty and interests of this new group. So since, as Judge Rupp pointed out, the designation decision just says, I'm going to the full scope of the statute, as is allowed, and as our first prior decision, I'm making Route 1, I guess, now. Recognize that's committed to agency discretion. It seemed like the Huffman Memorandum was the implementation guidance. And so as soon as they say we're expanding this to the full breadth, you don't know what procedures are going to be applied now that it's reaching this new thing. There's just nothing in the designation that speaks to that topic. It could be they had a whole panoply of whole new procedures, or it could be that they didn't. But the answer to that is not in the designation. That's in the Huffman Memorandum. So I guess two points. I'm not sure whether the Huffman Memo in its entirety was sort of setting out procedures, but we were really focused on one part of that memorandum, which was bringing expedited removal to bear against people who had affirmatively applied for asylum, which is not an issue at this stage right now on appeal. But I do think that the designation is the document and the agency action, the writing under E-3, which is bringing the statute and all accompanying procedures into effect against this new group of people. It provides the appropriate object of judicial review. It provides jurisdiction under E-3. And I think the question that the district court was reviewing correctly was whether the effect of the designation was to deprive individuals of their due process. And that's the sort of framing the district court adopted, and I think absolutely correct, because otherwise you would have sort of this fundamental problem, which is that, you know, well, it's sort of, you know, reflected in what's happened, which is you could have regulations sort of created in 1996, 1997, immediately after the statute is enacted, but the statute has never been actually brought to bear against people in the interior of the country or outside of ports of entry. And so, therefore, those regulations really have no meaning or effect until the designation is brought. That's how statutes of repose work, though. I mean, there's a harsh consequence to a statute of repose, but that is the consequence of a statute of repose. It doesn't matter that there may be new people against whom a certain policy is applied. A statute of repose means that, you know, means what it says. I understand, but I think that in this situation, there's in 1252e3, even if it were a statute of repose or some other statute of review, is, in fact, guaranteeing specifically constitutional review of new writings, which is exactly what the district court did here and what our action brought. But the constitutional review is still subject to the 60-day statute of repose. The constitutional claims aren't carved out from that. That's correct. Under e3, they are sort of covered by the statute. But I think that, again, this is the basis of the district court's reading, and I think the district court's reading of the statute was entirely correct to guarantee judicial review over this designation and its constitutional impacts on millions of people within the United States. Can I ask you about the APA?  So under MAKESA Road 1, we said that this almost identical designation decision was committed to agency discretion by law. And so something that is committed to agency discretion by law, then there's no APA cause of action. So how do we get an APA so-called stay under 705? I understand your question. On this one, I want to be completely open with you that this is an issue that I had not prepared to address with this argument. So I would appreciate sort of the ability to put it in writing because I don't want to state anything that's incorrect or sort of not supported by statutory text at this moment. So with those caveats, I'll just begin, which is that as I understand the MAKESA Road, the first MAKESA Road decision was it was about whether, yes, like certain APA claims, arbitrary and capricious, was specifically what was being decided in that case, whether there was law to apply for it and found that the way that the statute was written shielded it from judicial review. I think that constitutional claims are very different. There is sort of, I think, the formal way of that we understand in the district court understand is there's no discretion to violate the Constitution. So we set outside of those bounds.  Of course, there's no discretion to violate the Constitution, but the APA specifically covers constitutional claims. And MAKESA Road 1 says there's no APA cause of action for things that are committed to agency discretion. So then the APA is off the table. So MAKESA Road could bring an ultra-virus claim that there was, that this action with the designation is unconstitutional, violates due process. But then MAKESA Road can't get an APA so-called stay. I understand. And I think, again, here, and I apologize to the trial. I really don't want to state anything that's not supported by... This is a really important part of how MAKESA Road gets relief, though, because the entire premise of the stay is premised on the fact that there is an APA cause of action. I understand, Your Honor. This is not... Because if it was an ultra-virus claim, then the only relief you could get is an injunction. And so just to clarify, I mean, I think you would agree that 1252F1 prohibits the district court from entering an actual injunction. That's correct. So then an ultra-virus claim wouldn't get MAKESA Road the relief that it is seeking. You have to be in the APA space to get this so-called APA stay. Otherwise, you run right into 1252F1. I understand the framework, Your Honor, is setting out. And I think on this, like, if the court would like to hear more from me on this, I think it would probably be best in writing after the hearing. But it's your claim, essentially, you're challenging the lack of the new process for the broader scope of the enforcement. I think, in a way... That's true. I think part of the due process problem here is, in fact, as has been discussed already, the lack of procedural protections for certain aspects of the problem. I think that, really, at its core, though, you know, the basic fundamentals of due process that the Supreme Court has reaffirmed time and time again, notice a meaningful opportunity to be heard, those are completely lacking in the way that the expedited removal system is being brought to bear against this new group of people by the designation. And it's not only from... I think there was a lot of discussion about the lack of process, you know, the lack of notice about the continuous presence requirement, but it extends beyond that as well. Because even if somebody were to, for example, know that they could or had to demonstrate affirmative presence to exempt themselves from the process, there's no guarantee of any time to do so, to collect those documents, to contact a third party, let alone a lawyer. And there's no process by which they can formally bring those to the attention of an immigration officer or contest any adverse findings by the immigration officer or even correct gross error by an immigration officer. You know, those are reflected in the record, the documentation of the errors in the process that we provided the district court. And I think they were relied on by the district court in reaching her conclusion in this case. And I think that's really the core of the problem that the district court identified. Exactly how the government chooses to modify the process along with the new designation, I think it makes sense for the government to have the first crack at it and then submit it for judicial review. But I do think that the process as it stands now is too open to error, with grave harm for those who it affects, both those who might be within the two years as well as the many who are outside of the two years. While Christian has... Make the Road come forth with any particular plaintiffs who have suffered this particular harm? By particular harm, you know, we did identify... The harm that you say that they're not. I understand. Yeah. So I think that, you know, this was sort of brought by Make the Road as the organizational plaintiff as a pre-enforcement challenge in some ways. I mean, the statute, it was in effect. But there were people who... There was a Make the Road... Make the Road members, for example, were in 240 proceedings when the government moved to dismiss those proceedings to place them in expedited removal. In the record before the district court, no individual Make the Road member that we identified had actually been placed in expedited removal yet. That was the reason that we sought to stay in the first place. So how do you know what procedures are being used? Well, it was incumbent on the government to come forward with the procedures that they thought would defend against the due process challenge that we had. In fact, I believe, if I recall correctly, at the end of the hearing, the district court specifically asked the government attorney, you know, what happens if someone's erroneously placed in expedited removal who's been here for longer than two years and never got an answer from the government at that point. So there was an opportunity sort of for a full airing of the procedural... the procedures that the government thinks are in place for people. Other than that, what we had was evidence that we had gathered and, you know, which included sort of what we understood the policies in place that were relevant for this population were. And we presented that to the district court, and it's in the record. How does that response intersect with the fact that Congress places the burden of proof of showing more than two years of continuous presence on the hearing? I mean, I think that, you know, under the classic sort of Matthews balancing test, the fact that the burdens on the non-citizen in order to prove it would actually support the idea that there needed to be clear notice and additional time to meet that burden were the burden on the government in the first place, and perhaps lesser procedures could be required. But I think the fact that the statute places a burden on the non-citizen actually supports the position that the district court took, that there needed to be, you know, some process to do that. And again, this is a situation where, you know, in our record, even, you know, the individual plaintiffs in this case who were not party to the same motion, if you look at the sort of like their declaration and the expedited removal orders in their case, they had been in the country for nearly 10 years. They had also entered via visa. The expedited removal order, and this is in the record, essentially says you entered without inspection, which was false, and also said that you've been here for 10 years, which the presence for 10 years should have exempted them from ER. Yet, per the declaration in the record, that individual was removed from the country with her child within 24 hours of the encounter and not allowed to talk to a lawyer. This is the reality of expedited removal. This is not a theoretical question that errors have. That's been shown by multiple reports that Congress has itself authorized to study the system and its errors and propose corrections to it. And it's reflected in the record that we assembled and presented to district court. So none of these are abstract questions. These are real harms that occur because the designation is in place. Would you spend some time on the distinction between state and injunction as you see it and why you filed this particular relief and why you apparently contend that it is not injunctive relief? Of course, Your Honor. You know, I think that there's, of course, you know, there's the essential basics, I think, which the district court set out, are that, you know, the Supreme Court, for example, in the Kent, you know, drew a formal distinction between the operation of a stay and injunctive relief. You know, some of the notable differences were, for example, that a stay operates against an agency writing or an agency policy as opposed to in personam, like an injunction does. Another notable difference was that an injunction, formally and legally understood, also not only runs against a specific party, but also exposes them to contempt and further supervision of the court over any such contempt proceedings. A stay does not. Of course, the Kent also, I think, is very careful in explaining that, you know, the dissent in the Kent pointed to many of the same arguments that the government makes here. For example, you know, obviously, you know, in any sort of, like, common sense, you know, or natural language way of speaking, the stay sort of imposes a practical, it can impose sort of a practical effect of, you know, stopping a certain agency action or stopping certain courses of conduct from being taken. But that was not sufficient in the Kent. Instead, it was the formal differences that were made. I think in this case here, as the government pointed out, you've got to deal with not just the enjoin language of F2, you've got to deal with the enjoin or restrain language in F1. So what work, in your view, is restrain doing in F1? Yeah, I think here it's, my reading of it is very similar to the Fifth Circuit's reading of the same statute in the context of vacator at the end of the case, which is enjoin and restrain is being used as sort of the common couplet, similar to, like, federal rules, civil procedures, section 65, to describe and sort of to talk about the different forms of. And they would have done that in F2 as well. But I think that, of course, there's, of course, the, you know, heading of 1252 F1, which we've already discussed, as well as other sort of textual clues, which is that, you know. It's just, I'm sorry, I'm still struggling with, you know, maybe the belt and suspenders would work if there were just one provision here, but when you have two provisions right next to each other, and one says enjoin and one says enjoin or restrain, I'm not sure, I think we're duty-bound to understand what restrain means that's different than enjoin in F2. And so I'm still not hearing from you. I think you're just saying enjoin, enjoin, restrain. No real difference. I just, it's really hard to use that in a case like this when Congress was so explicit in neighboring provisions. Right, but Congress was also explicit in neighboring provisions to sort of name stays, for example. And Congress elsewhere has known how to specifically. My question is what restrain, do you have any meaning for restrain other than another word for injunction? I think the best reading of it is that it is, in fact, referring to the two different forms of injunctions, injunctions and temporary restraining orders. And that's the most specific. Why would they have wanted that in F2? It may be because F2 was, it may be because F2 was referring to a specific form of order regarding sort of like the removal of a non-citizen from the country. But I can imagine, you know, any court getting papers very quickly, someone's about to be removed in the next 24 hours and before the court even has time to sort of get papers in on it, they're going to have to issue a temporary restraining order. So I'm not sure why removal would be different. I understand that there may be, you know, even if there were ambiguity that would point to restrain having some other meaning, I do think that there are certain things that would counsel against sort of reading restraints go beyond sort of the injunctive form. Because I'm still trying to incorporate. So you don't have a definition of restrain other than enjoin or temporary restraining order. That's correct, Your Honor. That's the definition. And I think that, you know, I just want to point out sort of one problem that comes from sort of an expansive reading restrain outside of that language is that, you know, any form of order against a party could be understood to restrain them in some manner. You know, the declaratory judgment could be understood to restrain them in some manner from basically defining their legal actions. Why would we give restraint such a broad reading? I mean, when restraint is coupled with enjoined, there's a Supreme Court case called, I think, direct marketing, which talks about how restraint should be understood in its limited equitable meaning, not just as any kind of prohibition. So there's actual Supreme Court case law saying that's how restraint should generally be read when it's coupled with enjoined. I understand. But I do think that any sort of any interpretation of it that would extend, that would turn away from limiting it to sort of like an equitable form of injunction would, in fact, run into problems. Because then you would have cases where there could be no remedy provided because any remedy, no matter its form or no matter its origin, would be just understood as a sort of, in some way, a practical restraint on that party or the government in an immigration case. And so I think that would go, that runs the risk of going too far. And I think it's especially important, for example, you know, in the 1252 E3 context, which is where we're at where Congress specifically set out a process and guaranteed challenges to the validity of new writings, implementing the expedited removal statute. In this situation, when there's a short limited, there's a small window of time in which to bring a challenge to a writing 60 days. So in that form, and Congress specifically provided for systemic review of those new writings, there needs to be a form of remedy that does in fact go to the legality of that writing and address its use as a facial matter. And I think that's another reason why it's extremely important to read the enjoyment, the restraint language in a limited fashion, to ensure that there is review and there is standing in these cases. Will the declaratory adjustment be available? This court has already held, as I understand it, in the first make the road decision that declaratory relief is available, but nonetheless, you know, declaratory relief might have other limitations that would not provide the systemic relief that Congress had intended for these sorts of challenges. What limitation are you concerned about? I think there, there might be, there may be the issue of, you know, declaratory relief is sometimes understood as party specific. So the relief, the judgment, not extending to parties, not before the court in that case, for example, the declaratory relief ever be more broad. It may be like that's for the reserve question. That's correct. Your honor. To my understanding, just be absolutely careful about it. How would we say that Congress was deliberate in using the strain, but it wasn't deliberate when it used the subheading limit on injunctive relief? I, I completely, I agree your honor. And I think that's one of the reasons why the fifth circuit, for example, you know, I'm the ninth circuit as well. More recently understood and has read 1252 off one. So look specifically to injunctive relief, which is the category described in the heading of the statute. Do you have any members who are parolees? There are members who are parolees. We just, we, I don't, but just in the record. However, I don't believe in the record. It specifies that. I just want to be on behalf of parolees at this point. You just, at this point, no, this day is for people who are non-parolees. That's correct. But we, that's the members we identified were people who were not police. And what would be your response to that? This provides essentially a nationwide injunctive, or at least has nationwide impact. I mean, I think this goes back to sort of the distinction that we were discussing about the difference between, you know, a stay and injunctive relief. So there is of course that formal difference. I think that if your honor is asking about a different question, which is, you know, about whether if in fact, you know, it's a stay but could be narrowed and whether there's any sort of like, whether a narrowed version of this day would be appropriate in this case. Because make the road is soon and make the road is in New York. But yet, you know, depending on how we would work anything, it would go beyond just your membership. That's correct. Your honor. And I think that, you know, the district court again, address this twice, you know, twice in our case, and also in the companion case about expedited removal churla, which essentially, you know, it did a couple of things, which is first, there's a nice sort of practical and also constitutional problems with conditioning the remedy on a display of membership. You know, I think the sheet canvas, these issues with regards to make the road specifically the fact that, you know, member status is not known. So the membership is also shifting. There's no sort of clearly established sort of like membership ID that could be shown. And of course, the constitutional issue with having to disclose identity to the government in order to get relief against an illegal policy. But I think that there's also, you know, and of course, there's a structural issue here with ER, which is that, you know, the core of the procedural problem with expedited removal for this new group of people is that it doesn't really have any mechanism to screen people for whether they should be an expedited removal in the first place, or to stop those proceedings, for example, when they manifest a fear, and there's no review of that. And when compounded with the fact that it can occur incredibly swiftly and people are detained without access to counsel, it also just raises really the practical question of how any sort of limited stay as to make the road members would even work when the process occurs quickly, when people are deported quickly, when they're cut off from family, friends, their community, any lawyer or the organization itself. I mean, I understand those, those practical concerns, but how is the universal relief consistent with the Supreme court's decision in CASA? Well, I think again, this is CASA, you know, I think it's just the Supreme court was also clear it's limited to the statute there. The Judiciary Act of 1789 doesn't really address, you know, 705, 706 relief. So those, you know, that interpretation of the statute really shouldn't apply on, you know, to this day issued by the district court here. And do you believe that we have a pellet in terms of a pellet jurisdiction? You know, I, I understand. Yeah. And I, when Judge Millat had raised that question earlier, it was not one that we had raised. I don't, I would have to look more closely at it. Of course we didn't raise the claim, you know, in response to the government's motion for a stay here. There may be, again, I just want to be careful because we haven't briefed it and I haven't looked at it. You know, there may be an argument. There is no pellet jurisdiction over a 705 stay. I would also think there's also a question where even if there were a pellet jurisdiction over a stay, whether the standard and test for determining the under Carson for the appealability of a stay sort of is formally different in some ways from the question sort of address as to the interpretation of 1252-1 and the relationship between stays and injunctions. Right. I think on that question, it's really very naughty because, you know, the Carson factors and particularly the can't effectively be challenged later wrong, which sounds like a colon problem to me, I could be wrong. And I think that's one of the things that, you know, makes appeals of 405 stays much more difficult to obtain, but unless you're aware of anything, I don't know how else other than 1292-81, 405 stays can never be reviewed. There's nothing in the APA that I could find. It's only talked about reviewing agency accidents. There's nothing that I could find in the usual appellate jurisdiction things that would otherwise speak to 405 stays. And it just seems, you know, we've got this test we're supposed to wrestle with here. On the other hand, it would seem quite odd to me that Congress would create this opportunity for 405 interlocutors days and, you know, before pre-adjudication stays, but never allow them to be judicially reviewed. I understand your question with it. I just, with candor, I don't think I have an answer standing here right now on that specific question. Do you have thoughts on this 2019 guidance in reference to your, I can't remember, and I'm sorry, I'm just remembering what counsel said if it was introduced in district court, but not here. I don't think it's in the record at all. Right. I don't think so. I was trying to check while I was sitting there. I don't recall it. So I don't know. So you're not familiar. You haven't seen this guidance before. I don't think, I don't know whether I've seen it. Or just recently. Yeah, recently. Yeah, exactly. Recently. Because, you know, we did sort of challenge the previous iteration of this designation. And so perhaps we saw it at that point in the case. I have a question. What precisely is the liberty interest here for people who are unlawfully within the United States? Sure. I think that, you know, the liberty interest is of course sort of remaining in the United States. Why would someone who's here unlawfully have a liberty interest in remaining? Because in many cases, they're not actually, I mean, one simple answer is the fact that they're not removable at all under, perhaps they have some sort of status already. Then they're not unlawfully within the United States. Or for example, they might have access to certain forms of relief, such as asylum, withholding, any sort of number of visas and cancellation of removal. So there's a variety, you know, simply sort of like being here quote unlawfully doesn't eliminate the ability to stay here lawfully. That's the entire purpose of removal proceedings. So is the liberty interest, I mean, I think it's important to be precise about this because I think Make the Road says, well, there's a liberty interest in remaining. And maybe for individuals that the government, you know, has no evidence of their lawful status, they perhaps have a liberty interest in not being removed unlawfully, which is different than having a liberty interest in staying here. I think I follow the distinction your honor's making, but it's not one that's really reflected in the case law, which does sort of specifically talk about removal from the country, posing a grievous harm. For people who have some legal right to remain in the country. That's the entire question of sort of like removal proceedings at all, which is it's to assess people's claims for relief from removal and their underlying removability in the first place. Right. So until they can show that they are not subject to removal, their only liberty interest is in not being removed unlawfully. Perhaps, but I think that this is a little bit. Do you think that's just a semantic difference? I think that, again, I just want to be careful because I am sort of responding to this in the first time the government hasn't raised this specific point on its stay motion. So, you know, it may in fact just be a semantic difference. Perhaps there's more there to my understanding, you know, this, the case law doesn't draw sort of the distinction. I believe I think your honor may be drawing. I think that, I mean, you know, looking at all the different cases together about the liberty interest, for instance, there's no liberty interest to enter the country. So if you're stopped at the border and you have no right to come in, then you have no due process rights. Whereas once you somehow made it into the territorial United States, irrespective of how you came in, you have some, some liberty interests. You know, I'm just trying to square all of the different case law from the Supreme Court and this circuit in terms of understanding what is the, what is the liberty interest of someone who does not have a demonstrated lawful status and is subject to removal. Right. I mean, I think in a lot of cases the problem is that the relief that may be available, it's developed and applied for through the removal proceeding itself. So the question sort of, but again, this is something I would be happy to brief this question, you know, but the Supreme Court has indicated that the government suffers irreparable harm when it is stopped from effectuating this policy. So I would ask, why is that not the case here or is this different because of a constitutional violation? Your Honor, I think if I understood the question, this is, I guess again, this sort of goes back to this question. This is sort of like the comparison between, you know, a stay and perhaps an injunctive form of relief, but even if it doesn't, the district court did weigh sort of like the need for a preliminary stay before the end of the case and the actual sort of like purported injury to the government. I think here it's, I think here where it's sort of a unique position because the, the government has other forms of removal available to it. Of course, it has the full final plea of two 40 proceedings and also other forms of expedited proceedings where they are applicable. Those are fully available here. And I think that as the district court also recognized, there is no public interest or, you know, should be no government interest in administering a policy that has been deemed unlawful or unconstitutional. Do you have more questions? Thank you. Mr. Hanson, I think you asked for four minutes for a minute. Is that right? That's correct, your Honor. I'll try to be quicker than that. If I may, we might not be. Understood, your Honor. If I may, I'd like to make four quick points. The first is the standing, I believe, the closing council admitted that they have no members that are eminently likely to be placed in expedited removal. I think that is completely dispositive of the standing inquiry. I think there isn't someone in the Senate right now, but I mean, they meet the criteria for being placed within the order, at least a substantial risk of being, I should say, substantial risk of being placed in a given government practices that are alleged. I mean, there's, there's really no time to litigate once someone is in. Your Honor, I don't think there would be an exception. I mean, the summers requires eminence and they have not pointed to eminence. And in fact, I think you can see some of the flippancy, which would be with which they treated jurisdiction. They put standing in scare quotes. I mean, there's, there's some serious questions here that both sides have missed. So I think the scare quotes may have been flippant, but I take your point, your Honor. I think government has failed to make a number of jurisdictional arguments here. So. I think what there's, I think their point is that they say they've got people who meet all the criteria of getting swept up in this, including those who have two, four proceedings when two, four proceedings are getting dismissed and then people are immediately arrested and subjected to expedite removal proceedings. And so I just, I'm just qualifying what you said that I think the question before us is whether they've demonstrated substantial risk. It's certainly on her. And I think we're stacking contingencies on contingency. So I didn't read them to be explaining that any of their members were likely to be put imminently put in expedited removal. I think it would then be another level of contingency that they would be placed in a situation as to their continuous presence claim that they wouldn't have notices. They would fail to understand what was being put on them. We're now stacking probabilities and probabilities. And I think there's no way that that means. Is there people who would, who are now at imminent risk of being put in expedited removal that you can identify? I mean, I think there's some category here that I'm missing that are particularly likely. I mean, I think, I mean, certainly it's stayed at present. If, if, if that section seven or five say were to be stayed in present, I'm not aware specifically of what the priorities would be, but I think, you know, potentially anyone subject to it, that, that, you know, resources were available to initiate a expedited removal. I think those would be the targets. I don't know. When there wasn't a seven or five say, so anybody who's statutorily eligible for expedited removal, it's an imminent risk. I don't know. Not as the Supreme court has defined eminence. I think that that would be the most sort of probabilistic analysis that the Summers thought was efficient and that the majority rejected. They're supposed to show that there are, um, ISA agents now in my neighborhood. Summers requires them to identify members by name that are likely to have the government will understand will include, you know, domains here and pseudonymous litigation in this context. I mean, I think if there were underlying facts that, you know, as to those person's characteristics that would make out the reference, they have to give you the name, actual names of these individuals. I mean, obviously as soon as they give you a name, they're at imminent risk. Uh, no, your honor. I think the, the relevant care, if they could make out the relevant characteristics and prove their burden through pseudonymous declarations, I think that, that would likely suffice under Summers. I don't think I'm trying to figure out from you. What are the relevant beyond what they've done here, which is I'm in the category of people that has been getting swept up in these, in these, I get, you may dispute some of this factually, but at this preliminary stage, um, they've alleged and haven't heard factual disputes about this, that they are in a category, they have clients who are in a category of people who are at risk of being a substantial risk of being subjected to expedited removal proceedings. Both people have been here more than two years and then people less than two years who I take it are challenging the credible fear processes. So your honor, what I think, I think Summers is particularly instructive here. I think the approach that they've taken towards standing is to use this sort of probabilistic analysis. I'm asking you, you tell me. They would have to identify, they could use, I think they could use pseudonymous declarations, but those declarations would have to set forth facts that would indicate that particular person, uh, for whatever reason that, you know, that, uh, that they, that they previously, uh, attempted to do so. Or, you know, I, I believe that I am likely to face an imminent risk. I mean, certainly, um, the eminence is not dispensed with simply because it may be difficult. That's still what article three demands. Civil litigation. We don't, there's all kinds of pre enforcement litigation against agency action that you show I'm a regulated party and, um, I'm at substantial risk of, uh, incurring, whether it's monetary or other harms. Well, it's certainly honor. I mean, those represent far easier cases. This case, uh, this court has a clear case law that the object of a regulation usually has self-evidence standing such that usually they're one of the few that don't need to submit evidence of it. Um, it will not itself recognizes that the object of a regulation is more likely to have standing, but nonetheless, you still have to have eminence. Um, and that is what we have here is very much like the, uh, Sierra club and in summers where it's, you know, if you take it probabilistically, one of their members probably would, you know, walk around and, and a plot of forest land that might be subject to the regulation. That wasn't good enough. If you have someone who's been here more than two years continuously, injured unlawfully has been here more than two years, um, continuously, um, but would take them a while to get any evidence of that together. Are they so unclear whether they'll be able to meet their burden of proof? Are they an object of this regulation? Uh, it would depend the, uh, they are the object in the sense that if you're challenging the expanded scope there, the object of it is to the, whether or not the procedures are issue that is not the object of the challenge to action. The procedures that are, that are being used are the same procedures as we've discussed previously. And so I don't think that the object of the procedures. Um, the second I believe opposing counsel said that the practical effects of the section 705 stay was to what the practical effect was stopping action. I think that's exactly what all of them. And Gonzalez says, uh, 1252 F one restraints. Um, I think even if 1251 F F one didn't apply, um, this court would have to create a square split with at least the ninth circuit to hold the traditional blackboard principles. Don't apply to section 705, including the requirement of tailoring. The ninth circuit in the immigration defenders case is recognized that the CASA, uh, the requirement of CASA and more generally, the traditional blackboard principles, including tailoring, apply section seven to five states. And so, you know, we think that approach should be followed rather than split with. Um, and then finally, if I can just return to the due process, uh, we think there's a game is ultimately clear that the procedures at issue, uh, provided by Congress are constitutionally sufficient for those that have not been lawfully admitted. And I think the Kaplan case is really instructive on that. And Kaplan, the alien had lawfully presented herself at a port of entry, had been lawfully paroled into the United States, had developed extensive ties in the interior of the United States, had to live for eight years in the United States, including with her natural, uh, with her father, who was a naturalized citizen in the United States. Nonetheless, the Supreme court said, because you have never been admitted, you still get those due process rights. As if you were at the border, you know, eight years ago. And I think that's controlling here. And there's no reason that people that have unlawfully into the United States would possess any more due process rights than those who lawfully presented themselves at ports of entry and were lawfully paroled into the country. And indeed the Supreme court in the Williams case said an alien quote, does not become one of the people to whom things are secured by our constitution, by an attempt to enter forbidden by our law and quote. So I think for all of those reasons, their due process claim fails. Can I ask you quickly on 1292 a one? Um, if we do not treat four or five stays as being reviewable under 1292 a one, is there any other avenue for appellate review of such an order that you're aware of other than suppose mandamus? I think it gets very weird in that circumstance, which is why courts have uniformly just treated section 705 stays a pellet. I mean, I suppose it could be collateral order, but I think for many of the same reasons you would think like, if you thought that it's separate from the marriage, I think for all the reasons your honor would doubt that if you doubted the 1292 a applied collateral order likely wouldn't, I suppose a 1292 B certification is directly possible, but a district court that is issued to stay is very unlikely to grant such certification. I'm not sure that's true. It's supposed to do that not infrequently, but okay. So there's nothing else you're aware of other than, and then potentially mandamus. But you know, you certainly where remedy has all the characteristic effects of a preliminary injunction. I think there's every reason to believe the Congress would want that to be reviewable. So for the court, for some of those reasons you've just explained include that section 405 order is qualifies under 1292 a one for review because it has a practical effect of an injunction. And it's part under F2 and the statute, and it is an injunction. That's the weirdness of all this. There is a slight weirdness to that. That kind of calls to mind in the Obamacare case, for example, that the individual mandate was not a tax for purposes of the tax injunction act, but was a tax for purposes of satisfying the, the constitution. So I, you know, I don't think that that would certainly be unprecedented. I think the two things are, the two statutes are looking at very different sort of characteristics. But I would also note the oddity of, if you conclude there's no appellate jurisdiction because this is an  then the effect of it would be to tell the district court exactly what it needs to do. You know, ASAP where you'd be dismissing our appeal because we, for the very reason that we're likely to prevail in the merits, which would lead to a very strange circumstance. I think. Do you have a question? All right. Thank you very much to both council for extra argument time in case submitted.
judges: Millett; Rao; Childs